UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ROSE E. SANCHEZ,<br><br>            Plaintiff,<br><br>    vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,<br><br>            Defendant. | 4:14-CV-4071-KES<br><br><br>MEMORANDUM OPINION AND ORDER AFFIRMING THE DECISION OF COMMISSIONER |

Plaintiff, Rose E. Sanchez, seeks review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits. The Commissioner opposes the motion and moves the court to affirm the denial. For the following reasons, the court affirms the decision of the Commissioner.

### PROCEDURAL HISTORY

Sanchez applied for benefits on June 14, 2011, alleging disability since August 15, 2010. AR 156-62.[1] The Social Security Administration (SSA) denied Sanchez's application initially on August 18, 2011, and again upon reconsideration on January 25, 2012. AR 23, 78-83. Sanchez then requested an administrative hearing and appeared with counsel before Administrative

---

[1] All citations to "AR" refer to the appropriate page of the administrative record.

Law Judge James Olson (ALJ) on January 30, 2012. *See* AR 38-54. Thereafter,

the ALJ issued an unfavorable decision finding that Sanchez retained the

residual functional capacity (RFC) to perform past relevant work. AR 20-32.

Accordingly, the ALJ determined Sanchez was not disabled. AR 32. Sanchez

timely appealed the ALJ's decision and requested review by the Appeals

Council. Her request was denied on April 8, 2013.[2] AR 1-7, 18. On May 8,

2014, Sanchez commenced this action seeking judicial review of the

Commissioner's denial of her claim. Docket 1.

## FACTUAL BACKGROUND

Sanchez was born on September 25, 1957. AR 156. Sanchez obtained

her GED in June 1991. AR 203. She completed CNA job training in June 2000.

*Id.* Sanchez reported working three jobs from 1995 until the time of her

application. She worked at a factory, a nursing home, and most recently at a

convenience store as a deli cook. *Id.* Sanchez testified that her responsibilities

from her most recent job included using ovens and fryers, cooking, and

cleaning. AR 42. Sanchez stated she had not worked since August 15, 2010,

due to anxiety. *Id.* Sanchez also testified that she suffered from a heart attack

in November 2010. *Id.* According to Sanchez, after the heart attack she was

unable to perform daily functions and was limited by the side effects of her

medications. AR 42-51. Sanchez testified she still had constant pain and

---

[2] Because the Appeals Council denied Sanchez's request for review, the
ALJ's decision represents the final decision of the Commissioner for purposes
of judicial review. 42 U.S.C. § 405(g).

fatigue despite changes in her diet and exercise, along with assistance from her husband. AR 51.

## I.      Coronary Artery Disease and Peripheral Vascular Disease

On November 22, 2010, Sanchez experienced symptoms of a heart attack and was airlifted to Wyoming Medical Center. AR 272-73, 283.[3] Sanchez underwent a left ventriculogram, coronary angiography, and left heart catheterization on November 23, 2010. AR 291-93. On November 26, 2010, Sanchez underwent a coronary bypass graft times four. AR 294-95. Sanchez was discharged on December 1, 2010, with diagnoses of angina, left main and triple vessel coronary artery disease, diabetes mellitus, myocardial infarction, hypertension, hypercholesterolemia, tobacco abuse, peripheral vascular disease, depression, and anxiety. AR 272.

On December 16, 2010, Sanchez began treating with James Walder, M.D., a cardiologist at Regional Heart Doctors in Rapid City, South Dakota. AR 266. Sanchez was doing well after her surgeries, with no reports of chest discomfort or panic attacks since being discharged, and seemed to "be on the right medications." *Id.* Dr. Walder recommended, however, that Sanchez return to the Wyoming Medical Center to follow up with her surgeon. *Id.* The next day, Sanchez was seen by Eric Webb, PA-C, at the Wyoming Medical Center for

---

[3] It is unclear from the record whether Sanchez experienced similar symptoms before. Sanchez denied previous episodes of similar pain upon admittance at Wyoming Medical Center, AR 283, but the discharge summary notes she may have experienced similar symptoms that had gotten worse over the past year. AR 273.

treatment of her surgical wound which had opened due to Sanchez "moving, doing a lot of walking and carrying items." AR 280.

On March 22, 2011, Sanchez presented to Douglas Everson, M.D., a Family Medicine/General Practitioner, with a left ear complaint. AR 362. Sanchez had been hospitalized with an infection and was receiving intravenous antibiotics. *Id.* At her appointment, Sanchez claimed her symptoms from her heart condition were improving, and that she was not experiencing dyspnea[4] or chest discomfort with daily activities. *Id.*

Sanchez was again seen by Dr. Everson on April 18, 2011, for a bilateral ear complaint. AR 360. Sanchez did not report any changes in symptoms related to her heart condition. *Id.* On May 27, 2011, Sanchez saw Dr. Everson for a physical and medication refills, and reported dyspnea on exertion, but all other symptoms remained unchanged. AR 358. Dr. Everson ordered an electrocardiogram (EKG) and chest x-ray. The chest x-ray showed no acute cardiopulmonary abnormalities. AR 367. He indicated Sanchez needed to see a cardiologist and have a stress test performed. AR 359.

On July 1, 2011, Sanchez met with Dr. Everson for diabetic control and medication refills. AR 412. Sanchez reported chest discomfort and dyspnea with household activities and yard work. *Id.* Upon a lung examination, Dr. Everson concluded there was no dyspnea. AR 414. Dr. Everson once again indicated Sanchez needed an appointment with a cardiologist and to have a

---

[4] Dyspnea is shortness of breath. Mayo Clinic, http://www.mayclinic. org/symptoms/shortness-of-breath/basics/definition/sym-20050890 (last visited June 17, 2015).

stress test completed. *Id.* Dr. Everson did not note any changes on July 15, 2011, but ordered an echocardiogram (Echo) for July 21, 2011, and a stress test with Dr. Vanmarel on August 4, 2011. AR 409, 411.

At a follow-up appointment for her stress test on August 5, 2011, Sanchez reported her symptoms were worsening. She continued to experience chest discomfort and dyspnea with household activities and yard work. AR 406. Dr. Everson noted the nuclear medicine stress test was abnormal. *Id.* Sanchez was scheduled to see Dr. Walder for a consultation. AR 408.

On August 10, 2011, Sanchez reported to Dr. Walder that she was still having problems with chest discomfort and shortness of breath. AR 383. Dr. Walder confirmed the findings of the stress test, and determined Sanchez needed cardiac catheterization with coronary and graft angiography. AR 385. Dr. Walder placed two cardiac stents on August 18, 2011. AR 376-79.

On August 25, 2011, Sanchez met with Dr. Everson and continued to report chest discomfort and dyspnea with household activities and yard work, despite the two cardiac stents placed on August 18. AR 403. Dr. Everson ordered a same-day chest x-ray, which came back as stable and unremarkable. AR 415. On September 1, 2011, Sanchez met with Dr. Everson for a medication review and to continue diabetic treatment, and again reported chest discomfort and dyspnea despite attending cardiac rehab. AR 399.

Sanchez met with Dr. Walder on September 14, 2011, for a one-month post-hospital visit. AR 421. Sanchez reported she was unable to take deep breaths when walking and had taken nitroglycerin three times for chest

tightness, which was separate from her inability to take deep breaths. *Id.*

Sanchez reported the chest tightness sensation occurred when she exercised or

did housework like cleaning, laundry, or dishes. *Id.* Sanchez continued to

attend cardiac rehab and could walk for about twelve minutes on a treadmill

before experiencing the inability to take a deep breath. *Id.* Dr. Walder's report

concluded with:

> After talking with [Sanchez] at some length, I am not as concerned
> that she is having a lot of angina as I was when I heard about her
> situation from cardiac rehab and from telephone conversations
> with our nurses. The discomfort she gets on deep inspiration and
> on bending over probably is less related to her surgery and may
> not have changed a lot since then. The chest tightness on the other
> hand may well represent angina, but it is pretty infrequent.

AR 424.

Sanchez returned to Dr. Walder on October 5, 2011, for a stress test. AR

426. The scans returned normal and were "reassuring" as the results did not

indicate ischemia. AR 427. Despite the normal scans and continued attendance

at cardiac rehab, Sanchez still reported chest discomfort and dyspnea to

Dr. Everson at an October 20, 2011, appointment for treatment of depression.

AR 395.

On October 24, 2011, Sanchez had a follow-up visit with Julie Smyser, a

Family Nurse Practitioner, on behalf of Dr. Walder. AR 429. Sanchez reported

doing very well and denied any symptoms of dizziness, dyspnea, edema,

palpitations, syncope, or near syncope. *Id.* Sanchez did experience occasional

chest tightness while cleaning her house. *Id.* The episodes occurred only one or

two times per month and were rarely comparable to the pain she experienced

during her heart attack. *Id.* Smyser advised Sanchez to monitor these episodes and report if there was any increase in frequency or severity, and to schedule a follow-up appointment in six months. AR 432.

On November 4, 2011, Sanchez met with Dr. Everson. She continued to report episodes of chest discomfort and dyspnea with household activities and yard work despite attending cardiac rehab. AR 465. Dr. Everson noted Sanchez had an appointment with her cardiologist in three weeks. AR 461. Ten days later, on November 14, 2011, Sanchez reported to Dr. Everson that her symptoms were improving, and she denied any chest pain, dyspnea, fatigue, or use of her nitroglycerin. AR 470. Sanchez continued with her cardiac rehab. *Id.*

On December 9, 2011, Sanchez saw Dr. Everson and reported she had recently been seen in an emergency room in Spearfish, South Dakota, for symptoms similar to a heart attack. AR 475. Sanchez complained of chest pain, but not with daily activities, and she reported use of her nitroglycerin. *Id.* Sanchez also reported she had completed cardiac rehab. *Id.*

At a January 24, 2012, appointment with Dr. Everson, Sanchez denied chest discomfort, dyspnea, fatigue, or use of her nitroglycerin. AR 480. Sanchez made the same statements at her appointments with Dr. Everson from February to June 2012. AR 485, 491, 495, 500, 505.

Sanchez met with Dr. Walder on July 6, 2012 for a routine follow-up. AR 521. Dr. Walder noted Sanchez was doing reasonably well. *Id.* Sanchez still reported dyspnea on exertion but not too much trouble with chest tightness or angina. *Id.* Dr. Walder also noted Sanchez was walking at least a block a day

7

and also up and down stairs at her daughter's house for exercise. *Id.*
Dr. Walder considered Sanchez to be doing very well from the cardiac
standpoint with no clear-cut angina or congestive heart failure. AR 523. Dr.
Walder recommended a follow-up in six months, and if Sanchez decided to go
through with bariatric surgery, a repeat stress test and Echo would be ordered.
AR 524.

### A.    Dr. Walder's Cardiac Impairment Questionnaire

On April 2, 2012, Dr. Walder completed a Cardiac Impairment
Questionnaire covering his treatment of Sanchez from December 16, 2010, to
October 24, 2011. AR 433-37. Dr. Walder diagnosed Sanchez with diabetes
mellitus and coronary artery disease status-post quadruple coronary artery
bypass grafting supported by the clinical findings of chest pain, shortness of
breath, and fatigue. AR 433. Dr. Walder relied on the November 23, 2010, and
August 18, 2011, operation reports, lipid studies, and Sanchez's blood sugar
levels. AR 434. No side effects were noted from any of Sanchez's medications.
AR 435.

Dr. Walder stated Sanchez's main symptoms were chest pain, dyspnea
on exertion, and fatigue, which he believed were reasonably consistent with
Sanchez's impairments. AR 434. Sanchez's symptoms varied in frequency,
depended on activity, and were contributed to by emotional stress. Dr. Walder
opined the symptoms would increase if Sanchez were to be placed in a
competitive work environment. AR 434-35. Dr. Walder believed the symptoms
and limitations probably began on November 23, 2010. AR 437.

8

Based on a five-day work week, at eight hours per day, Dr. Walder opined Sanchez could sit for two to three hours at a time, stand or walk for zero hours, be able to frequently lift zero to five pounds and occasionally lift five to ten pounds, and occasionally be able to carry zero to five pounds. AR 435-36. Sanchez would be unable to push, pull, kneel, bend, or stoop at a regular job. AR 437. According to Dr. Walder, Sanchez's impairments would result in good and bad days, and it would be likely that Sanchez would be absent from work more than three times per month due to the impairments or treatment. AR 436. Dr. Walder also opined the symptoms were severe enough to frequently interfere with Sanchez's attention and concentration, and that Sanchez was incapable of handling low stress. *Id.* This finding was based on Dr. Walder's in-office observations, along with reports from Sanchez and her husband. AR 437.

## B.    Dr. Everson's Multiple Impairment Questionnaire

Dr. Everson completed a Multiple Impairment Questionnaire on June 28, 2012, for his monthly treatment of Sanchez from July 15, 2011, through June 28, 2012.[5] AR 506-13. Dr. Everson opined that Sanchez's prognosis with her diagnoses of coronary artery disease and diabetes mellitus type-2 was fair. AR 506. He based his opinion on clinical findings that Sanchez experienced dyspnea on exertion with poor exercise tolerance and that Sanchez's blood glucose levels remained over 300 despite good effort with her diet. AR 506.

---

[5] Dr. Everson used the information from the Multiple Impairment Questionnaire to compose a narrative dated December 25, 2012. AR 525. The information in the Questionnaire is identical to the narrative.

9

Dr. Everson identified Sanchez's primary symptoms as fatigue, shortness of breath, and poor exercise tolerance. AR 507. He opined these symptoms were reasonably consistent with Sanchez's impairments and likely started in November 2010. AR 507, AR 512. Dr. Everson also stated that Sanchez reported constant pain from neuropathy in both legs, precipitated by diabetes. AR 507-08. He rated Sanchez's pain as moderately severe and her fatigue as severe. AR 508. Dr. Everson reported he had been unable to completely relieve the pain with medication without unacceptable side effects. *Id.*

Based on a five-day work week, at eight hours per day, Dr. Everson opined Sanchez could sit for one hour, stand or walk for zero to one hour, and indicated it would be necessary or medically recommended for Sanchez not to sit, stand, or walk continuously. AR 508-09. Dr. Everson stated Sanchez could frequently lift zero to five pounds, and occasionally lift five to ten pounds. AR 509. He also indicated Sanchez could carry zero to five pounds frequently and occasionally carry five to ten pounds. *Id.* Dr. Everson did not believe Sanchez had any limitations on repetitive movements. *Id.*

Dr. Everson opined Sanchez's symptoms would increase if she were placed in a competitive work environment. AR 510. Sanchez's pain, fatigue or other symptoms were constantly severe enough to interfere with her attention and concentration. AR 511. Sanchez would have to miss work more than three times per month due to her impairments or treatments. AR 512. Unlike Dr. Walder, Dr. Everson noted Sanchez would be able to tolerate low stress in the workplace. AR 511. Dr. Everson did not note any other limitations that

10

would affect Sanchez's ability to work at a regular job on a sustained basis. AR 512.

## II.     Diabetes Mellitus

Prior to being seen at the Wyoming Medical Center on November 22, 2010, Sanchez had been diagnosed with diabetes mellitus type-2.[6] At her March 22, 2011, appointment with Dr. Everson, Sanchez reported her home blood sugar readings were within the normal range. AR 362. The same was reported to Dr. Everson from April through August 2011. AR 360, 358, 412, 409, 406, 403.

On September 1, 2011, Sanchez reported to Dr. Everson that her home blood sugar readings were high. AR 400. Dr. Everson increased Sanchez's medication to get her levels to a normal range. AR 402. At a September 14, 2011, appointment with Dr. Walder, Sanchez reported her blood sugar levels had gone over 500 and she had been sent to the emergency room. AR 421. Dr. Walder recommended seeing Dr. John Palmer, D.O., as soon as possible to get her blood sugar under control. AR 424.

On October 11, 2011, Sanchez met with Dr. Palmer for recommendations regarding poorly controlled type-2 diabetes. AR 390. Dr. Palmer noted Sanchez had significant insulin resistance with only a couple episodes of minor hypoglycemia. AR 393. Dr. Palmer advised normalizing Sanchez's insulin levels

---

[6] The medical records do not indicate when Sanchez was initially diagnosed with diabetes mellitus type-2 or which provider gave that diagnosis. There are no records of treatment for diabetes mellitus prior to November 22, 2010.

11

and assisting with dietary restrictions. *Id.* On October 24, 2011, Sanchez met with Julie Smyser, FNP, and reported that Dr. Palmer had prescribed more medications to get her diabetes under control, but denied any changes in exercise or diet to assist in controlling her diabetes. AR 429.

From October 20, 2011, until June 21, 2012, Sanchez reported high blood sugar readings to Dr. Everson. AR 395, AR 465, AR 470, AR 475, AR 480, AR 485, AR 495, AR 500, AR 505. Dr. Everson increased Sanchez's medication multiple times in an attempt to get her levels to a normal range. AR 461, AR 466, AR 481. In December 2011, Sanchez's glucose levels were slowly improving despite the reported high at-home readings. AR 471.

In March of 2012, after needing to stop a medication the prior month due to side effects, Sanchez expressed interest in an insulin pump. AR 481, AR 491. Dr. Everson adjusted Sanchez's insulin level and told her to continue the treatment plan implemented by Dr. Palmer. AR 486. In April and May 2012, Dr. Everson noted Dr. Palmer was switching Sanchez to different medications and advised Sanchez to follow Dr. Palmer's treatment plan. AR 492, AR 496. On June 21, 2012, Sanchez reported to Dr. Everson that her readings were still high despite the new medications. AR 505.

Dr. Palmer completed a Diabetes Mellitus Impairment Questionnaire on July 12, 2012. AR 514. Dr. Palmer indicated Sanchez had vascular and neuropathic complications with her diabetes, and that she suffered side effects of retinopathy, excessive thirst, fatigue, and general malaise from treatment. AR 515-16. Dr. Palmer opined the impairments would last at least twelve

12

months and were impacted by emotional factors, but deferred any questions related to Sanchez's residual functional capacity to her primary care provider. AR 517-18. He relied on Sanchez's elevated hemoglobin levels to support the diagnosis, and opined that Sanchez's history of coronary artery disease, arthritic complaints, and neuropathy was likely related to her diabetes. AR 439. Dr. Palmer denied having to switch Sanchez's medications due to adverse side effects, and again deferred questions regarding Sanchez's physical limitations to her primary care provider. AR 439-40.

## ALJ DECISION

On April 8, 2013, the ALJ issued a decision denying Sanchez's application for benefits. AR 20-32. In doing so, the ALJ used the sequential five-step evaluation process.[7] At step one, the ALJ determined that Sanchez

---

[7] An ALJ must follow " 'the familiar five-step process' " to determine whether an individual is disabled. *Martise v. Astrue*, 641 F.3d 909, 921 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)). 20 C.F.R. § 404.1520(a)(4)(i)-(v) provides that "(i) [a]t the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . . (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement of § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . . (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [subpart P of part 404 of this chapter] and meets the duration requirement, we will find that you are disabled. . . . (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . . (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If

had not engaged in substantial gainful activity since August 15, 2010. AR 25. At step two, the ALJ found that Sanchez was suffering from several severe impairments, namely: coronary artery disease, peripheral vascular disease, diabetes mellitus, and obesity.[8] *Id.* The ALJ further determined, however, that Sanchez's depression and high anxiety did not qualify singly or in combination as severe. *Id.* At step three, the ALJ determined that Sanchez did not have an impairment or combination of impairments that met or medically equaled a listed impairment. AR 26-28. At step four, the ALJ found that Sanchez had the RFC to perform a full range of light work. AR 28-31. Based on this RFC determination, the ALJ concluded that Sanchez could perform past relevant work as a deli cook. AR 32. Accordingly, the ALJ found that Sanchez did not qualify for benefits under the Social Security Act.

## STANDARD OF REVIEW

The court must uphold the ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's

---

you cannot make an adjustment to other work, we will find that you are disabled."

[8] The ALJ found that Sanchez's obesity is a severe medically determinable impairment and considered her obesity when evaluating whether Sanchez's other impairments met or equaled a listed impairment. Sanchez did not challenge the ALJ's consideration of her obesity.

conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)). The court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010). If the Commissioner's decision is supported by substantial evidence in the record as a whole, the court may not reverse it merely because substantial evidence also exists in the record that would support a contrary position or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by substantial evidence in the record as a whole, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are

reviewed de novo with deference accorded to the Commissioner's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

Before an ALJ moves to step four, the ALJ must determine the claimant's RFC. 20 C.F.R. § 404.1520(a)(4). A claimant's RFC "is the most [she] can still do [in a work setting] despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).  The RFC assessment is an indication of what the claimant can do on a "regular and continuing basis" given the claimant's limitations. 20 C.F.R. § 404.1545(b). " 'The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.' " *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). The RFC must include the limitations from all medically determinable impairments, regardless of whether they are considered severe. *See* SSR 96–8p, 1996 WL 374184 at *5 (SSA 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' ").

In determining Sanchez's RFC, the ALJ considered Sanchez's heart attack in November 2010 that resulted in a coronary artery bypass surgery, her past medical history of diabetes and hypertension, anxiety, depression, and medications. AR 28-30. The ALJ made findings on Sanchez's credibility, and

16

considered medical opinions from Dr. Walder and Dr. Everson as well as
several state agency physicians. AR 28-32. The ALJ ultimately determined
Sanchez had the RFC to perform the full range of light work as defined in 20
C.F.R. § 404.1567(c).

## I.  Sanchez's Credibility

Before the ALJ can make a determination on a claimant's RFC, "the ALJ
must determine the applicant's credibility, as [her] subjective complaints play a
role in assessing [her] RFC." *Ellis v. Barnhart*, 392 F.3d 988, 995-96 (8th Cir.
2005) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1217-18 (8th Cir. 2001)).
"[W]hen evaluating a claimant's credibility, in addition to considering the
absence of objective medical evidence to support complaints of pain, an ALJ
should consider a claimant's reported daily activities, the duration, frequency
and intensity of his or her pain, precipitating and aggravating factors,
medication, and functional restrictions." *Steed v. Astrue*, 524 F.3d 872, 875 n.4
(8th Cir. 2008) (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)); *see* 20
C.F.R. § 404.1529(c)(3). "The ALJ is not required to discuss methodically each
*Polaski* consideration, so long as [the ALJ] acknowledged and examined those
considerations before discounting [Sanchez's] subjective complaints." *Steed*,
524 F.3d at 876 (internal quotation omitted). An ALJ must make express
credibility determinations detailing reasons for discounting a claimant's
subjective complaints of pain. *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir.
2010). An ALJ's credibility determination is entitled to deference because the

17

ALJ is in a better position than a reviewing court to gauge credibility. *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).

Sanchez argues the ALJ erred in concluding that Sanchez was not working due to reasons unrelated to her medical conditions. Docket 12 at 15. The record of Sanchez's summary earnings showed she did not work during the years 1983-1988, 1990-1992, 2011, and 2012. AR 170. Even when Sanchez did work, her yearly earnings ranged from $128.00 to $7,688.59. *Id.* This record supports the ALJ's conclusion that Sanchez had a record of poor work history "showing [Sanchez] worked only sporadically prior to the alleged disability onset date[.]" AR 28. The ALJ was within reason to question whether Sanchez's unemployment was actually due to disability. *Id. See Wright v. Colvin*, No. 14-2834, 2015 WL 3650732, at *5-6 (8th Cir. June 15, 2015) (finding claimant's credibility lacking where claimant did not file for disability until two years after leaving last employer); *Ellis* 392 F.3d at 996 (citing *Woolf*, F.3d at 1214 (noting that a sporadic work history is relevant to the ALJ's credibility analysis); *Polaski*, 739 F.2d at 1322 (noting work history as one factor to consider in credibility determination)).

Next, Sanchez argues the ALJ erred in finding Sanchez's heart surgery relieved her symptoms. Docket 12 at 15.  Sanchez relies on her progress notes post-heart surgery that indicate persistent chest pain, dyspnea, and restrictions on daily living, along with a contradiction to the ALJ's finding that Sanchez did not suffer from significant fatigue. *Id.* The ALJ observed that the objective medical evidence did not support Sanchez's testimony of pain and

18

inability to work. AR 28-29 (noting the medical findings did not match
Sanchez's "testimony at the hearing that she experiences such severe
limitations as pain, tiredness and fatigue, and her allegation that she
experiences side effects of 'grogginess' from her medication"). Inconsistency
with objective medical evidence is a valid reason to discount a claimant's
subjective complaints. *See Ellis*, 392 F.3d at 996 (holding "[w]hile the ALJ may
not discount [claimant's] complaints solely because they are not fully
supported by objective medical evidence, [the] complaints may be discounted
based on inconsistencies in the record as a whole.") (citing *Lowe v. Apfel*, 226
F.3d 969, 972 (8th Cir. 2000)). The court agrees with the ALJ that the medical
evidence is inconsistent with Sanchez's testimony during the hearing.

Sanchez also argues the ALJ erred in finding that her treatment regime
was conservative and that her symptoms were manageable with medication. A
pattern of conservative treatment is a proper factor for the ALJ to consider in
evaluating a claimant's credibility. *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th
Cir. 2001). Sanchez argues her medical history of a quadruple heart bypass
and a second procedure to insert two stents is not conservative treatment.
Docket 12 at 16. But Sanchez fails to dispute that within one month of her
quadruple heart bypass she reported to be doing well and only needed follow-
up for treatment of her surgical wound due to "moving, doing a lot of walking
and carrying items." AR 266, 280.

The record further shows that, in addition to standard check-up
procedures, Dr. Walder and Dr. Everson routinely ordered stress tests, chest x-

19

rays, and EKGs to determine her various manifestations of pain. *See* AR 359, 411, 414, 415, 426. These tests found no abnormalities. Any pain that Sanchez was unable to handle was addressed by use of nitroglycerin. *See* AR 421. The ability to successfully control pain with medication can be inconsistent with an allegation of disabling pain. *Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009). If an impairment can be controlled through treatment or medication, it cannot be considered disabling. *Id.* (citing *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997)). Thus, Sanchez may disagree with the ALJ's characterization of her treatment as conservative, but that observation is supported by the record. The ALJ therefore did not err in concluding that Sanchez's allegations of pain were not fully credible based on her treatment history.

Finally, Sanchez argues that the ALJ did not provide a detailed analysis for each *Polaski* criteria. For example, Sanchez notes that the ALJ did not include a specific finding as to her testimony on symptoms and resulting limitations, her limited activities of daily living, and her lack of significant improvement with treatment. The ALJ is not required to explicitly discuss each *Polaski* factor, so long as the framework is acknowledged before discounting Sanchez's subjective complaints. *Steed*, 524 F.3d at 876. The ALJ specifically discussed Sanchez's daily activities; the duration and frequency of her symptoms; and Sanchez's functional restrictions. *Polaski*, 739 F.2d at 1322. The ALJ also expressly made a credibility finding. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). The issue before this court is not whether the ALJ's credibility finding is unassailable, but whether it is supported by substantial

20

evidence. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Pearsall*, 274 F.3d at 1218 ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). Based on the record as a whole, the ALJ's credibility determination is supported by substantial evidence.

## II.    **Medical Opinion Evidence**

A treating physician's opinion on the nature and severity of the claimant's impairments is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (quoting *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995)). An ALJ may "discount or even disregard the opinion of a treating physician where . . . a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (citations omitted). If a treating physician's opinion is not given controlling weight, the ALJ should consider several factors in weighing it and any other medical opinions in the record, such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion, and the specialization of the source. 20 C.F.R. § 404.1527(c). The ALJ must always give good reasons for the weight afforded to a treating physician's evaluation. 20

21

C.F.R. § 404.1527(c)(2); *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). The

ALJ will also consider opinions from non-examining sources. 20 C.F.R.

§ 404.1527(e).

### A.   Treating Physicians

Dr. Walder completed a Cardiac Impairment Questionnaire on April 2,

2012. AR 433-37.[9] According to Dr. Walder, Sanchez could sit for two to three

hours at a time, stand or walk for zero hours, and would be able to frequently

lift zero to five pounds, occasionally lift five to ten pounds, and occasionally be

able to carry zero to five pounds. AR 435-36. Sanchez would not be able to

push, pull, kneel, bend, or stoop while working at a regular job. AR 437.

The ALJ observed Sanchez was doing well as of her first appointment

with Dr. Walder in December 2010. She did not report any chest discomfort or

panic attacks, and Dr. Walder noted she was being treated with the proper

medication. AR 266. Although Sanchez suffered a setback in the course of

treatment, which required an additional surgery, she reported one month later

that the sensations of chest tightness she experienced came from exercising or

doing housework like cleaning, laundry or dishes. AR 421. Dr. Walder was not

concerned about angina at that point, and Sanchez was instructed to meet

with Dr. Walder's nurse practitioner at her next appointment. AR 424, 429.

Sanchez reported to the nurse practitioner that she continued to experience

---

[9] Dr. Palmer completed a Diabetes Mellitus Impairment Questionnaire on
July 12, 2012. AR 514-19. Dr. Palmer provided responses in relation to
Sanchez's symptoms and impairments, but deferred any questions relating to
Sanchez's physical limitations to her primary care providers. AR 517-18.

chest tightness, but it occurred when Sanchez cleaned her house. AR 429. During the last reported visit with Dr. Walder, Sanchez reported to be doing well, was walking at least a block a day, and was also walking up and down stairs for exercise. AR 521. Dr. Walder considered Sanchez to be doing well from a cardiac standpoint and was not worried about angina or congestive heart failure. AR 523.

Dr. Everson completed a Multiple Impairment Questionnaire on June 28, 2012. AR 506-13. According to Dr. Everson, based on a normal 40-hour work week, Sanchez could sit for one hour, stand or walk for zero to one hour, and indicated it would be necessary or medically recommended for Sanchez not to sit, stand, or walk continuously. AR 508-09. Sanchez could frequently lift zero to five pounds, and occasionally lift five to ten pounds. AR 509.  She would also be able to carry zero to five pounds frequently and occasionally carry five to ten pounds. *Id.* Additionally, Dr. Everson opined there would be no restrictions on repetitive movements. *Id.*

The ALJ noted Sanchez did not report any complaints about her heart symptoms to Dr. Everson until May 2011. AR 358. Dr. Everson ordered an EKG and chest x-ray. Neither showed any abnormalities. AR 359, 367. Again, in July, Sanchez reported discomfort, but Dr. Everson's lung examination concluded there was no dyspnea. AR 412, 414. Sanchez again met with Dr. Everson one week after having two stents placed and reported chest discomfort and dyspnea, which occurred with household activities and yard work. AR 403. Although Sanchez reported that she would use medication to

23

cure any chest discomfort, those complaints completely subsided in 2012. AR 480, 485, 491, 495, 500, 505.

The ALJ discounted the portions of Dr. Walder's and Dr. Everson's reports based on the subjective reports by Sanchez. AR 31. The Eighth Circuit has recognized that an ALJ may discount a treating physician's conclusions when those conclusions are largely based on the subjective reports of the claimant. *McDade v. Astrue*, 720 F.3d 994, 999 (8th Cir. 2013). Furthermore, the ALJ found that the treatment records and clinical findings of Dr. Walder and Dr. Everson conflicted with the extreme limitations they suggested in their reports. AR 31; s*ee Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006) (finding that the ALJ was permitted to disregard claimant's treating physician's opinion when it was unsupported by other evidence in the record, specifically when treating physician failed to place any limitations on claimant's activities prior to disability filing).

Sanchez faults the ALJ's decision for not explicitly articulating the factors set forth in 20 C.F.R. § 404.1527(c). Sanchez argues both Dr. Walder and Dr. Everson regularly treated Sanchez since at least the time of her heart attack in November 2010, that the nature of that treatment was focused on Sanchez's heart and diabetic conditions, that both doctors provided support for their opinions, and those findings are consistent and do not conflict with any treatment records or testing. Docket 12 at 13.

First, the record does not support Sanchez's claim that Dr. Walder and Dr. Everson had treated Sanchez since her November 2010 heart attack. While

Dr. Walder had treated Sanchez since shortly after the heart attack (December 2010), her first appointment with Dr. Everson was not until March 2011. AR 266, 362. Second, although Sanchez discussed her heart condition with Dr. Everson, that condition was not the basis of their treatment relationship. Her first appointment with Dr. Everson was for an ear complaint. *Id.* Other appointments were for physicals, medication refills, and other unrelated medical conditions. *See, e.g.,* AR 358, 362, 395.

Third, the support Sanchez claims both doctors used for their opinions was not well established in the record. The questionnaires filled out by Dr. Walder and Dr. Everson provided little context or reasoning for why they believed the specific limitations assigned to Sanchez were appropriate. The Eighth Circuit has explained that such evaluations do not carry much evidentiary value. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (agreeing "that a conclusory checkbox form has little evidentiary value when it cites no medical evidence, and provides little to no elaboration.") (quotation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding the ALJ was correct to discount a treating physician's report that "consists of three checklist forms, cites no medical evidence, and provides little to no elaboration."). The ALJ was therefore justified in giving less weight to the questionnaires filled out by Dr. Walder and Dr. Everson.[10] *Metz v. Shalala*, 49

---

[10] Sanchez argues that the ALJ mistakenly concluded that Dr. Walder based his opinions primarily on Sanchez's subjective complaints. Docket 12 at 11-12; AR 31. The ALJ misconstrued question seventeen on Dr. Walder's Cardiac Impairment Questionnaire. AR 436-37 ("17. To what degree can your

F.3d 374, 377 (8th Cir. 1995) (finding the conclusory report from a treating physician was not entitled to any more weight than another medical opinion).

Finally, Sanchez's claim that Dr. Walder's and Dr. Everson's findings are consistent and do not conflict with any treatment records or testing is not supported by the record. Dr. Walder opined Sanchez would be able to stand or walk for zero hours, and could sit for two to three hours at a time. AR 435-36. Dr. Everson opined Sanchez would be able to sit for one hour, and stand or walk for zero to one hour. AR 508-09. But in Sanchez's Function Report, she does not list walking or sitting as areas her conditions affect. AR 222. In fact, Sanchez put in her Function Report and reported to Dr. Walder and Dr. Everson that she was able to cook, walk around stores, walk around the block, exercise, and do household chores for two to three hours at a time. AR 30, 51, 219, 220, 222, 521.

The ALJ found the severe limitations reported by Dr. Walder and Dr. Everson to be inconsistent with the normal findings from the objective medical tests. For example, the ALJ noted Sanchez had normal EKG readings, along with normal heart sounds and no dyspnea with exertion or palpitations

---

patient tolerate work stress? . . . Please explain the basis for your conclusions.") The explanation was meant to refer to Dr. Walder's analysis of Sanchez's ability to handle work place stress, not to Dr. Walder's entire report. Sanchez was not prejudiced by the ALJ's mistake. *See Van Vickle v. Astrue*, 539 F.3d 825 (8th Cir. 2008) (holding there was "no indication the ALJ would have decided differently had he read the hand-written notation to say 'walk' rather than 'work[.]' "). Thus, the ALJ's error, if any, was harmless. *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("Even if the ALJ had not erred, there is no indication that the ALJ would have decided differently."); *see also Renstrom v. Astrue*, 680 F.3d 1057, 1068 (8th Cir. 2012); *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008).

on multiple occasions. An ALJ may give less weight to a treating physician's opinion because it is not supported by the medical findings. *Prosch*, 201 F.3d at 1013 (citations omitted). The ALJ did not err by giving less weight to the treating physicians' opinions as he still considered those opinions as part of the record as a whole.

### B.      State Agency Examiners

Dr. Whittle and Dr. Erickson are state agency physicians who evaluated Sanchez's physical limitations. Dr. Whittle completed his RFC assessment on Sanchez's initial claim on August 10, 2011. AR 56-64. Based on medical records from November 2010 to May 2011, Dr. Whittle found that Sanchez could occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds. AR 61. She could stand or walk about 6 hours in an 8-hour day, and sit for about 6 hours in an 8-hour day. *Id.* Dr. Whittle found these limitations were due to Sanchez's heart problems and diabetes. *Id.* He also found that Sanchez did not have postural, manipulative, visual, communicative, or environmental limitations. AR 62. Dr. Whittle concluded Sanchez's symptoms were not substantiated by the objective medical evidence alone, and the reports of activities of daily living within the medical records were the most informative in assessing the credibility of Sanchez's statements. AR 60-61. Dr. Whittle determined that Sanchez could perform light work. AR 62.

Dr. Erickson completed his RFC assessment on January 23, 2012, with regard to Sanchez's claim at the reconsideration level. AR 66-75. He reviewed

medical records from November 2010 through December 2011. AR 67-70.
Dr. Erickson's findings with regard to lifting, carrying, standing, walking, and
sitting were the same as Dr. Whittle's findings. AR 72-73. He also found that
Sanchez did not have postural, manipulative, visual, communicative, or
environmental limitations. AR 73. Based on his assessment, Dr. Erickson
concluded Sanchez could perform light work. AR 74.

        The ALJ chose to give the opinions of the state agency examiners greater
weight than the treating physicians. AR 31. A review of the record as a whole
supports the ALJ's reliance on the state agency experts' conclusions over those
given in Dr. Walder's and Dr. Everson's reports. Importantly, the ALJ
determined that Dr. Walder's and Dr. Everson's conclusions regarding
Sanchez's limitations were not consistent or supported by either their own
records or the record as a whole. AR 31. By contrast, the ALJ determined
Dr. Erickson and Dr. Whittle's findings were consistent with and supported by
the record. *Id.* Thus, the ALJ had good reasons to give Dr. Walder's and
Dr. Everson's reports less weight than the reports of the state agency
examiners.

        Even though the state agency physicians were unable to review the entire
record, the ALJ considered the record as a whole and properly afforded more
weight to the state agency physicians. As reflected in the RFC, the ALJ
generally accepted the findings of Dr. Erickson and Dr. Whittle as consistent
with the medical record in order to establish Sanchez's RFC. AR 30-31. And
although the state agency physicians did not have Sanchez's records from

28

2012, the ALJ included Sanchez's records from that time frame in the RFC. AR 30-32. *See Barrows v. Colvin*, No. C13-4087-MWB, 2014 WL 3339790, at *13 (N.D. Iowa July 1, 2014), (report and recommendation stating that "[s]imply pointing to new evidence, without attempting to explain how that evidence might undermine the 'stale old' opinions, is hardly persuasive."), *report and recommendation adopted in part, rejected in part*, 2015 WL 1510159 (N.D. Iowa March 31, 2015). The weight ascribed to the medical opinion evidence as well as the ALJ's findings as they pertain to Sanchez's physical limitations is supported by substantial evidence.

## CONCLUSION

Substantial evidence in the record as a whole supports the ALJ's determination of Sanchez's residual functional capacity. The ALJ did not err in his credibility determination, and the ALJ properly considered the medical opinion evidence. Accordingly, it is

ORDERED that the decision of the Commissioner is affirmed.

Dated June 26, 2015.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE